

*hmg.5.7.25*
ADE/MPP: USAO # 2024R00025

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL NO.** ABA-25-144 |
| v. | (Health Care Fraud, 18 U.S.C. § 1347; Transactional Money Laundering, 18 U.S.C. § 1957; Aiding and Abetting, 18 U.S.C. § 2; Forfeiture, 18 U.S.C. § 982, 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c)) |
| **PATRICK TORMAY BRITTON-HARR,** | |
| Defendant. | |
| | **UNDER SEAL** |

### INDICTMENT

The Grand Jury for the District of Maryland charges that:

### COUNTS ONE THROUGH FIVE
### Health Care Fraud

At all times material to this Indictment:

#### The Defendant and Relevant Entities

1. Defendant **PATRICK TORMAY BRITTON-HARR** ("**BRITTON-HARR**") was a resident of Maryland and Florida.

2. Among other entities, **BRITTON-HARR** owned and controlled Provista Health, LLC ("Provista"), Coastal Laboratories, Inc. ("Coastal Labs"), Coastal Management Group, Inc. ("Coastal Management"), and AMS Onsite, Inc. ("AMS Onsite"), all of which were based in Annapolis, Maryland.

3. Provista was a Maryland limited liability company that provided clinical laboratory testing to nursing homes and other facilities. Provista performed clinical laboratory testing at laboratories it operated in Arizona for a short period of time in 2020, and referred laboratory tests to other clinical laboratories.

4. Coastal Labs was a Delaware corporation that owned Provista.

5. Coastal Management was a Delaware corporation that provided marketing services for Coastal Labs.

6. AMS Onsite was a Delaware corporation that provided infection control and prevention services to nursing homes and other facilities, including by soliciting quarterly respiratory tests for residents of nursing homes and other facilities.

7. **BRITTON-HARR** opened, controlled, and was a signatory on various bank accounts held in the names of the entities identified above, including accounts at Truist Bank (formerly BB&T Bank) ending in x8122 in in the name of Provista, ending in x5116 in the name of Coastal Labs, ending in x2988 in the name of AMS Onsite, and ending in x3258 in the name of Coastal Management.

## Medicare Program

8. The Medicare Program ("Medicare") was a federally funded health care program that provided benefits to individuals who were 65 years old and older, and to certain disabled persons. The benefits available under Medicare were governed by federal statutes and regulations. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within the U.S. Department of Health and Human Services ("HHS").

9. Medicare was a "health care benefit program," as defined in Title 18, United States Code, Section 24(b).

10. Medicare was divided into four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D). Medicare Part B covered medically necessary physician office services and outpatient care,

including laboratory tests.

11. Individuals who qualified for Medicare benefits were referred to as Medicare "beneficiaries." Medicare beneficiaries were issued beneficiary identification cards that certified eligibility for Medicare and identified each beneficiary by a unique number.

12. Physicians, clinics, laboratories, and other health care providers (collectively, "providers") that provided items and services to Medicare beneficiaries were able to apply for and obtain a "provider number." Providers that received a Medicare provider number were able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

13. When seeking reimbursement from Medicare for provided benefits, services, or items, providers submitted the cost of the benefit, service, or item provided together with a description and the appropriate "procedure code," as set forth in the Current Procedural Terminology ("CPT") Manual or the Healthcare Common Procedure Coding System ("HCPCS"). Additionally, claims submitted to Medicare seeking reimbursement were required to include: (i) the beneficiary's name and Health Insurance Claim Number ("HICN"); (ii) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (iii) the name of the provider, as well as the provider's unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI"). Claims seeking reimbursement from Medicare were able to be submitted in hard copy or electronically.

14. Medicare, in receiving and adjudicating claims, acted through fiscal intermediaries called Medicare administrative contractors ("MACs"), which were statutory agents of CMS for Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for services rendered to beneficiaries. The MACs were responsible for processing

Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

15. To receive Medicare reimbursement, providers, including laboratories, were required to apply to the appropriate MAC and execute a written provider agreement in which an authorized representative of the provider agreed, among other things, to comply with all Medicare-related laws and regulations and not to submit claims for payment to Medicare knowing they were false or fraudulent or with deliberate ignorance or reckless disregard of their truth or falsity.

16. Payments under Medicare Part B were often made directly to the provider rather than to the beneficiary. Medicare paid for claims only if the items or services were medically reasonable, medically necessary for the treatment or diagnosis of the beneficiary's illness or injury, documented, and actually provided as represented.

17. In certain limited circumstances, Medicare permitted laboratories to establish arrangements with so-called "reference laboratories." Such arrangements existed when a laboratory received a specimen for testing, but instead of testing the specimen in-house, the laboratory acted as a "referring laboratory" by sending the specimen to another laboratory, the "reference laboratory," to complete the testing. When submitting claims for reimbursement for specimens tested by a reference laboratory, Medicare required the referring laboratory to identify the reference laboratory that performed the test.

## Laboratory Testing

18. Clinical laboratories performed various tests, including tests for COVID-19 and respiratory pathogens. These tests were often performed on specimens collected from nasal

swabs. Physicians, nurse practitioners, and other authorized providers could issue orders for laboratory testing for Medicare beneficiaries and other patients.

19. Laboratories could perform tests to detect whether an individual had COVID-19. Laboratories could also perform tests to detect a variety of viral and bacterial respiratory pathogens. Tests for respiratory pathogens were sometimes performed in "panels" that targeted multiple pathogens, known as a respiratory pathogen panel ("RPP"). Panels could be designed to test different numbers of pathogens.

20. Claims for reimbursement of laboratory tests were submitted to Medicare using CPT codes, a set of standardized codes used by medical professionals, laboratories, and other medical providers to describe the services they provided. There were CPT codes for RPP tests that targeted multiple pathogens, as well as codes for individual pathogen tests that could be included in a panel.

21. In general, the amounts Medicare reimbursed laboratories for RPP tests and other respiratory pathogen tests were several times higher than the amounts they reimbursed for COVID-19 testing.

### The Scheme to Defraud

22. From in or around February 2020, and continuing through in or around August 2021, in the District of Maryland and elsewhere, the defendant, **PATRICK TORMAY BRITTON-HARR**, in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute and attempt to execute a scheme to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain and attempt to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, Medicare, aided and abetted by others, and aiding and abetting others known and unknown to the Grand Jury, in violation of Title 18, United States Code, Sections 1347 and 2 (hereinafter the "scheme to defraud").

### Purpose of the Scheme to Defraud

23. It was a purpose of the scheme to defraud for the defendant, **BRITTON-HARR**, to unlawfully enrich himself and others by: (a) submitting and causing the submission of false and fraudulent claims to Medicare for RPP tests during the COVID-19 pandemic that were medically unnecessary, not provided as represented, not performed, and ineligible for reimbursement; (b) concealing the submission of false and fraudulent claims; and (c) obtaining proceeds of the fraud for the personal use and benefit of the defendant and others, and to further the fraud.

### Manner and Means of the Scheme to Defraud

24. The manner and means by which the defendant, **BRITTON-HARR**, and others known and unknown to the Grand Jury sought to accomplish the objects and purpose of the scheme to defraud included, among other things:

  a. **BRITTON-HARR** controlled, operated, and directed Provista, Coastal Labs, Coastal Management, and AMS Onsite.

  b. **BRITTON-HARR** submitted and caused the submission of enrollment documents to Medicare for Provista, in which he attested he would not knowingly present or cause to be presented false and fraudulent claims for payment by Medicare and would not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

  c. After the COVID-19 pandemic began, **BRITTON-HARR**, through the entities he controlled, obtained specimens from Medicare beneficiaries and others for the purpose of performing COVID-19 testing (the "COVID-19 Specimens"). The COVID-19 Specimens were collected from residents at nursing homes and other facilities in Maryland and elsewhere to conduct screening tests to identify and isolate individuals infected with COVID-19. At **BRITTON-HARR**'s direction, the COVID-19 Specimens were sent to a reference laboratory, which conducted the COVID-19 tests.

  d. At **BRITTON-HARR**'s direction, after the COVID-19 Specimens were tested for COVID-19 by a reference laboratory, the COVID-19 Specimens were generally sent either to Provista's laboratories in Arizona or to reference laboratories, where **BRITTON-HARR** caused single-panel RPP tests to be performed on the COVID-19 Specimens that had been collected for the purpose of performing COVID-19 screening tests.

  e. **BRITTON-HARR** caused the RPP tests to be performed even though the physicians and medical professionals treating the residents of the nursing homes and other facilities ordered only COVID-19 tests and did not order RPP tests, and even though it was not medically necessary to conduct RPP tests on asymptomatic individuals who were being screened to identify

COVID-19 infections.

f. **BRITTON-HARR** caused Provista to submit false and fraudulent claims to Medicare for RPP tests performed on the COVID-19 Specimens, in that the claims were submitted for tests that were not ordered as represented, medically unnecessary, and ineligible for reimbursement.

g. **BRITTON-HARR** further caused Provista to submit false and fraudulent claims to Medicare for RPP tests that were never performed, including by causing the submission of claims to Medicare for tests that were purportedly performed on specimens collected from beneficiaries after they had died.

h. When submitting the false and fraudulent claims to Medicare for the RPP tests, **BRITTON-HARR** caused Provista to submit claims using false and fraudulent CPT codes, which, among other things, concealed that the RPP tests were performed in a single panel and made it falsely appear as though certain tests were performed individually, in order to receive and maximize reimbursement for services that Medicare would not have otherwise paid for.

i. When submitting claims to Medicare, **BRITTON-HARR** caused Provista to conceal that certain tests were not performed by Provista but were instead purportedly performed by reference laboratories.

j. **BRITTON-HARR** caused Medicare reimbursements to be deposited into Provista's bank account, from which **BRITTON-HARR** caused transfers to be made to other bank accounts he controlled to fund purchases of real estate, cars, and other luxury items.

k. In total, **BRITTON-HARR** caused Provista to submit more than $15 million of false and fraudulent claims to Medicare for RPP tests that were not ordered as

represented, medically unnecessary, not performed, and ineligible for reimbursement. As a result of these false and fraudulent claims, Medicare paid Provista more than $5 million.

## The Charges

25. On or about the dates set forth below, in the District of Maryland and elsewhere, the defendant,

**PATRICK TORMAY BRITTON-HARR,**

for the purpose of executing and attempting to execute the scheme to defraud as described above, submitted and caused to be submitted the following false and fraudulent claims to Medicare that that were medically unnecessary, not provided as represented, not performed, and ineligible for reimbursement, each constituting a separate count:

| Count | Medicare Beneficiary | Approx. Date of Service | Approx. Date Claim Submitted | Procedure Codes | Approx. Amount Billed to Medicare |
|---|---|---|---|---|---|
| 1 | H.F. | 7/28/20 | 9/11/20 | 87486, 87496, 87498, 87502, 87532, 87541, 87581, 87640, 87798 | $796.90 |
| 2 | E.L. | 8/17/20 | 9/11/20 | 87486, 87496, 87498, 87502, 87532, 87541, 87581, 87640, 87798 | $796.90 |
| 3 | W.A. | 8/19/20 | 9/11/20 | 87486, 87496, 87498, 87502, 87532, 87541, 87581, 87640, 87798 | $796.90 |
| 4 | E.K. | 8/19/20 | 9/11/20 | 87486, 87496, 87498, 87502, 87532, 87541, 87581, 87640, 87798 | $796.90 |

| 5 | V.B. | 8/19/20 | 9/11/20 | 87486, 87496, 87498, 87502, 87532, 87541, 87581, 87640, 87798 | $796.90 |

18 U.S.C. § 1347
18 U.S.C. § 2

10

## COUNT SIX
## Conducting Transaction in Criminally Derived Proceeds

1. The allegations in paragraphs 1 through 7 are realleged and incorporated herein by reference.

2. On or about December 30, 2020, in the District of Maryland and elsewhere, the defendant,

**PATRICK TORMAY BRITTON-HARR,**

did knowingly engage and attempt to engage in monetary transactions by, through, or to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, that he caused a wire transfer of approximately $112,500 from the Truist account ending in x3258 in the name of Coastal Management to Car Dealership 1 to purchase a Porsche 911 vehicle, such property having been derived from a specified unlawful activity, that is, health care fraud, in violation of Title 18, United States Code, Section 1347.

18 U.S.C. § 1957(a)
18 U.S.C. § 2

## FORFEITURE ALLEGATION

The Grand Jury for the District of Maryland further finds that:

1. Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. § 982, 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c), in the event of the defendant's conviction on any of the offenses charged in this Indictment.

### Health Care Fraud Forfeiture

2. Pursuant to 18 U.S.C. § 982(a)(7), upon a conviction of any of the offenses set forth in Counts One through Five of this Indictment, the defendant, **PATRICK TORMAY BRITTON-HARR**, shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

### Money Laundering Forfeiture

3. Pursuant to 18 U.S.C. § 982(a)(1), upon a conviction of the offense set forth in Count Six of this Indictment, the defendant, **PATRICK TORMAY BRITTON-HARR**, shall forfeit to the United States any property, real or personal, involved in the offense, or any property traceable to such property.

### Substitute Assets

4. If any of the property described above, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property that cannot be subdivided without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c).

*Kelly Hayes /ADE*
_____
KELLY O. HAYES
United States Attorney
District of Maryland
36 S. Charles Street, 4th Floor
Baltimore, Maryland 21201


LORINDA LARYEA
Acting Chief
Criminal Division, Fraud Section
United States Department of Justice

*Christopher Wenger*
_____
CHRISTOPHER A. WENGER
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice
1400 New York Avenue, N.W.
Washington, D.C. 20005
(202) 445-9670

A TRUE BILL:

**SIGNATURE REDACTED**
_____
Foreperson

5/8/2025
_____
Date